**SEALED**

CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
02/01/2019
JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
DEPUTY CLERK

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:  ) <br> INFORMATION ASSOCIATED WITH  ) <br> **GAB USERNAME @JACKCORBIN**  ) <br> WHICH IS STORED AT PREMISES  ) <br> CONTROLLED BY GAB AI, INC.  ) | Case No. 3:19-mj-00008 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
FOR A WARRANT TO SEARCH AND SEIZE**

I, W. Wade Douthit, being duly sworn, depose and state as follows:

**INTRODUCTION**

1. I am a Special Agent of the United States Department of Justice, Federal Bureau of Investigation ("FBI") and have been so employed since June 1999. I am assigned to the Richmond Field Office, Charlottesville Resident Agency, located in Charlottesville, Virginia. My principal duties include the investigation of, among other matters, hate crimes, riots, and threats of violence in violation of the laws of the United States.

2. I am a federal law enforcement officer under applicable provisions of the United States Code under Rule 41(a) of the Federal Rules of Criminal Procedure. I have received training in and have experience in the enforcement of the laws of the United States, including the preparation and presentation of search warrants, and in executing court-ordered search warrants.

3. I make this affidavit in support of an application by the United States of America for a warrant to search and seize evidence associated with the following account at Gab AI, Inc.: @jackcorbin, further described in Attachment A.

4. Based on the information below, I submit there is probable cause to believe the aforementioned Gab account will contain evidence, as more fully identified in Attachment B, of violations of federal law, including, but not limited to, Title 18, U.S.C. § 245 (Hate Crimes), Title 18, U.S.C. § 2101 (Riots), and Title 18, U.S.C. § 875 (Threats).

5. Through training and experience, the Affiant has knowledge that domestic terrorists and persons affiliated with white supremacists groups and/or conspirators will utilize cell phones, and other electronic devices, electronic mail ("e-mail"), and social media to conduct their illegal activity and maintain contact with other confederates, conspirators and criminal associates involved with the planning, targeting, and execution of their political or social goals to include, but not limited to, espousing violence.

6. The Affiant bases this affidavit upon personal knowledge and observations made during the course of this investigation, information conveyed to me by other law enforcement officers assigned to this investigation, and upon my personal review of records, documents, and items lawfully obtained by third parties. This affidavit is not intended to include each and every fact known to me or the other investigating agencies, nor does it reflect all the evidence developed during the course of the investigation. Instead, the Affiant has set forth sufficient information to establish probable cause for the issuance of the requested search warrant. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part.

## RELEVANT STATUTES

7. Federally Protected Activities, Title 18, United States Code, Section 245(b)(1)(A), provides that "Whoever, whether or not acting under color of law, by force or

threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with (1) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from – (A) voting or qualifying to vote, qualifying or campaigning as a candidate for elective office, or qualifying or acting as a poll watcher, or any legally authorized election official, in any primary, special or general election" shall be guilty of a federal offense.

8. Federally Protected Activities, Title 18 United States Code, Section 245(b)(4), provides that "any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from – (A) participating, without discrimination on account of race, color, religion or national origin, in any of the benefits described in subparagraphs (1)(A) through (1)(E) or subparagraphs (2)(A) through (2)(F)" shall be guilty of a federal offense.

9. Riots, Title 18, United States Code, Section 2101(a) provides that "Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent—(1) to incite a riot; or (2) to organize, promote, encourage, participate in, or carry on a riot; or (3) to commit any act of violence in furtherance of a riot; or (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot; and who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified" shall be guilty of a federal offense.

10. Title 18, Section 2102 defines a riot as "a public disturbance involving (1) an act or acts of violence by one or more persons part of an assemblage of three or more persons which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual."

11. Title 18, Section 2102 states "the term 'to incite a riot', or 'to organize, promote, encourage, participate in, or carry on a riot', includes, but is not limited to, urging or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts."

12. Threats, Title 18, United States Code, Section 875(d) provides that "Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime" shall be guilty of a federal crime.

**JURISDICTION**

13. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**BACKGROUND**

14. On August 12, 2017, a "Unite the Right" rally was held at Emancipation Park in Charlottesville, Virginia. The proclaimed purpose of the planned rally was to protest the removal of the Robert E. Lee and Thomas "Stonewall" Jackson statues in Charlottesville, Virginia. Several groups espousing right-wing nationalist and/or white supremacist views attended the rally in support.

15. In addition, several thousand counter-protestors attended the rally to oppose the rally and its supporters. Throughout the day, several instances of violence occurred between protestors and counter-protestors. At approximately noon, the rally was declared an unlawful assembly by the Charlottesville Police Department ("CPD"), and both protestors and counter-protestors dispersed from the park.

16. At some point prior to January 7, 2019, Candidate A decided to run for the Democratic Nomination to the Charlottesville City Council. Candidate A planned to announce his candidacy at an event scheduled for January 8, 2019. On January 7, 2019, the local newspaper publicized the January 8, 2019, event at which Candidate A planned to announce this candidacy.

17. In response to the news, on January 7, 2019, Gab user @jackcorbin posted threatening communications indicating that Candidate A was on video assaulting someone during the "Unite the Right" rally on August 12, 2017. These communications called for Candidate A to drop out of the race, used racial epithets, and requested others to participate in violence at Candidate A's political events. On January 8, 2019 the Affiant, after becoming aware of the threats, notified Candidate A about the threats in compliance with FBI policy. During the event on January 8, 2019, Candidate A announced that he was putting his campaign for City Council on hold in order to deal with health issues. On January 9, 2019, Candidate A told the Affiant that he had a legitimate health concerns, but that the threat did have an impact on his decision to put his candidacy on hold.

**PROBABLE CAUSE**

18.     The FBI is conducting an investigation into possible violations of federal criminal law committed by DANIEL WILLIAM MCMAHON ("MCMAHON").  The investigation was initiated following receipt of information indicating that MCMAHON and others were conspiring to commit violence and other forms of intimidation to prevent Candidate A from running for the publicly elected office of Charlottesville City Council.

19.     On January 7, 2019, the Daily Progress, a local newspaper in Charlottesville, Virginia, published an article, "[Candidate A . . .] running for City Council."  Candidate A was planning to announce his run for Charlottesville City Council in the upcoming June 11, 2019 Democratic primary election. The article also indicated that Candidate A was planning a launch party on January 8, 2019 at 5:00 pm at the Kardinal Hall, located at 722 Preston Avenue, Charlottesville.

20.     In response to the article, a user on the Gab.ai social media platform, using the screen name @jackcorbin, posted a link to a Youtube video (https://www.youtube.com/watch?v=sP8KO9ZsZpA) with the following comment:

[Candidate A], the nigger terrorist attacking [redacted] in this video, is running for City Council in Charlottesville.  I will do everything in my power to stop him from getting elected for his attack on my people, & I do mean everything.  Unlike Wes Bellamy, this nigger is known to be a violent terrorist, so he won't be getting a hand shake from me like Bellamy did.

21.     The video depicts an African-American man wearing a black-colored baseball cap, black shirt and dark blue pants with glasses and a University of Virginia cinch-style back pack, swinging a stick at individuals involved in a physical altercation on 2nd Street NE on the morning of August 12, 2017.

22. Following this post, there were several comments posted. Of note is the following conversation between user Joseph Kleinschmidt (@Kleinschmidt) and @jackcorbin:

@Kleinschmidt:

GOOD, Do whatever you need to do, fuck that fucking nigger. This is our fucking country.

@jackcorbin:

I ask that you join me. This is not a one man job. Activism against [Candidate A] with a diversity of tactics must be used to stop his candidacy. This fucker is as bad as Nicolas Maduro.

@Kleinschmidt:

I would dress as opposition, go to these events and dress as a lefty commi, not hard. park far away. You could walk around and get in close till something happens then get them from behind their group. Always get on 2 sides at least of a large group.

@Kleinschmidt:

the ones who are gonna do something are always in front going crazy, if you wanted you could get through the crowd fairly easily and pull one of the frontliners down or backwards or whatever.

@jackcorbin:

Indeed.

23. Additionally, @jackcorbin posted a link to an article on the www.nbc29.com website, "[Candidate A] and [redacted] to Announce City Council Candidacies." With the following comment:

I'm going to issue a formal warning to [Candidate A].  Do not run for office after what you did to our people on August 12.  If you think I'm going to allow a violent communist like you to run for office after attacking one of my people with a rake handle, you got another thing coming.  Drop out now.

24. @jackcorbin continued posting:

@jackcorbin:

I'm going to add something to Charlottesville activism in 2019 in addition to supporting our political prisoners, and that is stopping violent terrorist [Candidate A] from being elected to the Charlottesville City Council after he committed a violent hate crime on [redacted]. I endorse a diversity of tactics for the activism against [Candidate A].

@jackcorbin:

I am declaring [Candidate A] to be the most dangerous violent Antifa in the USA, ranked over Baked Sprayer (Spencer Sunshine's bodyguard), because he is running for office after attacking our people with a rake handle.  [Candidate A] has a murderous Anti-White mentality similar to Nicolas Maduro of Venezuela.  His candidacy is a threat to national security and every White man on Earth, I am not fucking around.  He must not be allowed to get elected.

25. In response to this post, JASON KESSLER, who uses the screen name @TheMadDimension on both Gab.ai and Twitter took a screenshot from Gab and posted the following to his Twitter account:

@TheMadDimension:

Just like [redacted], who was sentenced today, [Candidate A] committed a felonious assault by attacking a man with a stick.

While [redacted] goes to prison [Candidate A] goes free and seeks public office.

Unfortunately, any attacks on him will only increase his support among Charlottesville residents. Take the high road and avoid harassment, ethnic slurs, or anything that would let this creep claim a p...

26. To this, @jackcorbin responded:

"Bro. A diversity of tactics must be used. You know how dangerous this man is. What if [Candidate A] rapes a white woman while in office?"

27. @jackcorbin continued to post:

I am seriously afraid that if [Candidate A] is elected, he will pull a Bill Cosby on multiple White women. We already know he's violent and hates White People. He is literally slime.

28. On January 9, 2019 @jackcorbin posted on Gab a link to an article on the Daily Progress Website which describes Candidate A's decision to put his campaign on hold. In the posting, @jackcorbin stated:

A day after an article comes out about him attacking [redacted] with a rake handle, [Candidate A] puts his Charlottesville City Council campaign on hold, citing "health issues from a heart attack". But we all know the real reason [Candidate A] put his campaign on hold. His violent terrorist actions on August 12 are haunting him along with a Pal Horse! :D"

29. On January 10, 2019, @jackcorbin posted the comment "Hail Victory!" with a link to an article on the website bigleaguepolitics.com documenting Candidate A's decision to put his campaign on hold.

30. On January 9, 2019 @jackcorbin posted on Gab comments in response to an article indicating that Candidate B was running for City Council in Charlottesville, Virginia:

@jackcorbin:

[Candidate B] is running for Charlottesville City Council. Though she is not as bad or violent as [Candidate A], she is a threat due to her unstable husband. . . . Her views are likely as radical as her communist husband. We are NOT violent, I will NOT endorse a "diversity of tactics" to stop her campaign like I did with [Candidate A]. Instead, we will rely on traditional opposition research.

31. In the aforementioned post regarding Candidate B's candidacy, @jackcorbin indicates that because Candidate B is non-violent, @jackcorbin will not endorse a "diversity of tactics" in opposing her candidacy. By contrast in the public conversations regarding Candidate A, @jackcorbin repeatedly endorses a "diversity of tactics." Because @jackcorbin defines the distinction based upon @jackcorbin's perception that Candidate A was "violent" while Candidate B was not, your Affiant believes this "diversity of tactics" to be a euphemism intended to convey a call for violence.

32. On March 26, 2018, FBI Task Force Officer, and Virginia State Police Special Agent DINO CAPPUZZO conducted a telephone interview of DANIEL W. MCMAHON, born August 17, 1988. During the interview MCMAHON acknowledged that he posted a video from

2017, entitled "Proof Antifa Started the Violence in Charlottesville", using the online identity Jack Corbin.

33.     FBI Pittsburgh Division is currently conducting an investigation of the shooting at the Tree of Life Synagogue on October 27, 2018 in Pittsburgh, Pennsylvannia.  As part of that investigation, the FBI executed a search warrant on the Gab.ai account belonging to the shooter, ROBERT GREGORY BOWERS.  The results of the warrant indicated that BOWERS was a follower of @jackcorbin and @jackcorbin was a follower of BOWERS's account on Gab.

34.     On January 8, 2019, your affiant contacted Candidate A and briefed him on the potential threats to his campaign based upon publicly available information on Gab.

35.     On January 9, 2019, the Daily Progress, published another article titled, "Candidate A delays start of his campaign", which detailed that Candidate A has decided to suspend his campaign to focus on health issues.  Also on January 9, 2019, Candidate A stated to the Affiant that while he did have a legitimate health concern, the threat to his campaign events did have an impact on his decision to put his campaign on hold.

36.     On January 14, 2019, the FBI emailed legal@gab.ai requesting Gab AI, Inc to preserve records for any accounts using the name: @jackcorbin.  Also on January 14, 2019, Gab replied that they had received the request for preservation and that the preservation was complete and they were waiting receipt of the warrant.

37.     From my review of publicly available information provided by Gab AI, Inc. about its service, including Gab's "Privacy Policy," I am aware of the following about Gab and about the information collected and retained by Gab.

38. Gab owns and operates a free-access social-networking website of the same name that can be accessed at https://gab.ai. Gab allows its users to create their own profile pages, which can include a short biography, a photo of their choice, and location information. Gab also permits users to create and read short messages as posts, and to restrict their posts to individuals whom they approve. These features are described in more detail below.

39. Upon creating a Gab account, a Gab user must create a unique Gab username and account password, and the user may also select a different name to identify his or her Gab account. The Gab user may also change this username, password, and name without having to open a new Gab account.

40. Gab asks users to provide basic identity and contact information, either during the registration process or thereafter. This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers. For each user, Gab may retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Gab account.

41. A Gab user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page. In addition, Gab users can post short "bios" to their profile pages.

42. Gab also keeps IP logs for each user. These logs contain information about the user's logins to Gab including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.

43. As discussed above, Gab users can use their Gab accounts to post short messages. Each post includes a timestamp that displays when the post was made to Gab. Gab users can also "repost," "reply", "quote", "upvote", or "downvote" the posts of other users. In addition, when a post includes a Gab username, often preceded by the @ sign, Gab designates that post a "mention" or "tag" of the identified user. In the user's page on Gab, Gab provides a list of all posts from other users in which the user has been mentioned or tagged, a list of all the comments to posts made by the user, and a list of other users who have reposted a post by the user.

44. Gab users may send photos and images in their posts.

45. A Gab user can "follow" other Gab users, which means subscribing to those users' posts and site updates. Each user profile page includes a list of the people who are following the user (the user's "followers" list) and a list of people whom that user follows (the user's "following" list). Gab users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their posts are visible only to the people whom they approve, rather than to the public (which is the default setting). A Gab user can also group other Gab users into "groups" that display on the user's home page. Gab also provides users with a list of "Who to Follow," which includes a few recommendations of Gab accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

46. In addition to publishing posts, a Gab user can also send messages directly to one of his or her followers. These messages are typically visible only to the sender and the recipient.

47. Gab users can configure the settings for their Gab accounts in numerous ways. For example, a Gab user can configure his or her Gab account to send updates to the user's mobile phone.

48. Gab includes a search function that enables its users to search all public posts for keywords, usernames, or subject, among other things.

49. If a Gab user does not want to interact with another user on Gab, the first user can "mute" the second user, preventing the post from the second user from being visible to the first user. Additionally, Gab users can block other users from following them.

50. Gab also collects information on the particular devices used to access Gab. In particular, Gab may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Gab.

51. Gab also may communicate with the user, by email or otherwise. Gab collects and maintains copies of communications between Gab and the user.

52. As explained herein, information stored in connection with a Gab account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Gab user's account activity, IP log, stored electronic communications, and other data retained by Gab, can indicate who has used or controlled the Gab account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a

residence. For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the Gab account at a relevant time. Further, Gab account activity can show how and when the account was accessed or used. For example, as described herein, Gab logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Gab access, use, and events relating to the crime under investigation.

53.     Lastly, Gab account activity may provide relevant insight into the Gab account owner's state of mind as it relates to the offense under investigation. For example, information on the Gab account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

54.     Based on the information above, the computers of Gab are likely to contain all the material described above with respect to the Gab account @jackcorbin including stored electronic communications and information concerning the subscriber and their use of Gab, such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the accounts at particular times.

## CONCLUSION

55.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Gab who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/W. Wade Douthit*
W. Wade Douthit
Special Agent - FBI

Received by reliable electronic means and sworn and attested to by telephone on February 1, 2019.

Subscribed and sworn before me this 1st of February 2019.

_____
JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE